# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **CLEARWATER BENEFITS, LLC,** | § | |
| *Plaintiff* | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. A-22-CV-802-RP** |
| **PLANSTIN ADMINISTRATION, INC.** | § | |
| **and ZION HEALTH,** | § | |
| *Defendants* | § | |
| | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO: THE HONORABLE ROBERT PITMAN**
**UNITED STATES DISTRICT JUDGE**

Before the Court are Defendants' Motion to Compel Arbitration of Clearwater's Claims, filed September 15, 2022 (Dkt. 8); Plaintiff's Response in Opposition to Defendants' Motion to Compel Arbitration, filed September 28, 2022 (Dkt. 12); Defendants' Reply in Support of Defendants' Motion to Compel Arbitration, filed October 19, 2022 (Dkt. 15); and Plaintiff's Sur-Reply in Opposition to Defendants' Motion to Compel Arbitration, filed by leave of Court on January 2, 2023 (Dkt. 28).[1]

## I.    Background and Procedural History

Plaintiff Clearwater Benefits, LLC ("Clearwater"), a Texas limited liability company, brings this breach of contract action against Utah corporations Planstin Administration, Inc. ("Planstin") and Zion Health ("Zion") (collectively, "Defendants"). Defendants argue that the contractual dispute must be sent to arbitration under the parties' binding arbitration agreement.

---

[1] By Text Order entered October 13, 2022, the District Court referred the Motion to Compel Arbitration to this Magistrate Judge for Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

Clearwater is a Texas medical insurance and health benefits broker that "represents numerous clients ranging from individuals to employer group plans and assists them in finding medical, dental, vision, and other health benefits products that suit their individual needs." First Am. Compl. (Dkt. 10) ¶ 5. Clearwater earns commissions and fees by referring its clients to insurance companies and other health care product providers. *Id.*

Planstin is a third-party administrator that provides administrative services for health plans, including employer-sponsored ERISA health plans. *Id.* ¶ 6. Planstin also provides services to individuals and independent contractors by helping them establish "single employer-employee" ERISA plans that are referred to as "MEC Plans," or minimum essential coverage plans. *Id.* Zion, a subsidiary or affiliate of Planstin, is a nonprofit corporation that operates a medical cost sharing ministry ("MCS") and sells memberships to individuals. *Id.*

Clearwater alleges that in late 2019 or early 2020, it began looking for new MEC and MCS providers for its clients and contacted Defendants to discuss starting a business relationship. *Id.* ¶ 7. Clearwater alleges that it planned to sell products and refer clients to Defendants in exchange for commissions and fees paid to Clearwater. Clearwater contends that: "Through a series of meetings, phone calls, and emails, Clearwater and Planstin/Zion reached an agreement on a commission and fee schedule in which Planstin/Zion agreed to pay Clearwater certain per employee/per month ('PEPM') fees." *Id.* Although there was not an official written contract, Clearwater refers to the emails "detailing the commission agreement" as the "Broker Commission Agreement." *Id.* (citing Dkt. 10-1).

Clearwater alleges that it began referring clients to Defendants in April 2020. From May 2020 through February 1, 2022, Clearwater alleges, Defendants "would collect premiums from its members and customers, provide Clearwater with a Broker Compensation Report, and then pay

Clearwater its commissions and fees based on the Broker Commission Agreement on the 24th or 25th of each month per the commission schedule contained in the Broker Commission Agreement." *Id.* ¶ 8. Clearwater contends that "[t]he Parties' conduct establishes that the Broker Commission Agreement was a contract wherein Planstin/Zion agreed to pay Clearwater, as an insurance broker, commissions and fees based on an agreed schedule." *Id.* Clearwater contends that it referred its clients to Defendants, and Clearwater acted as its clients' broker of record. *Id.*

Clearwater alleges that after working with Defendants for over a year under the Broker Commission Agreement, it began to explore opportunities to find a way to provide ERISA-compliant group health plans to employers with large independent contractor work forces (*e.g.*, real estate brokers and agents). *Id.* ¶ 9. Clearwater alleges that Defendants' president, Nathan Udy, recommended a way he contended would allow for an employer-sponsored ERISA-compliant captive insurance program – obviating the need for compliance with individual state's insurance requirements – in which independent contractors could enroll. *Id.* Clearwater alleged that it then started negotiations with several potential partners to establish an employer-sponsored captive insurance program. On November 16, 2021, Clearwater and Associate Owners Group, Inc.[2] entered into a Master Joint Venture Agreement ("JV Agreement") for the creation and operation of the Clearwater Captive Insurance Program ("Clearwater CIP"). Dkt. 10-4 at 1-39.

Clearwater alleges that it needed a third party to administer the Clearwater CIP. Accordingly, on December 2, 2021, Clearwater entered into a Business Services Agreement ("BSA") with Planstin in which Planstin agreed to "provide general health benefit administration services and third-party administration services" to the Clearwater CIP in exchange for monthly service fees. Dkt. 14-1 at 2. The BSA contains a mediation and arbitration provision requiring the parties to

---

[2] Defendants were not a party to the JV Agreement.

submit any disputes arising out of the agreement to mediation and then arbitration in accordance with the American Arbitration Association's Commercial Arbitration Rules ("AAA Rules"). *Id*. at § 23 ("Arbitration Provision").

Clearwater alleges that "[t]he terms of the BSA and the roles of Clearwater and Planstin are very different than under the Broker Commission Agreement." Dkt. 10 ¶ 11. Clearwater contends that under the Broker Commission Agreement, Clearwater serves as an insurance broker, receiving PEPM commissions from Defendants for members enrolled in Defendants' plans, whereas Clearwater's role in the BSA was to be that of the employer-sponsor, not an insurance broker. *Id.* Clearwater further alleges that "neither Clearwater nor Planstin ever performed under the BSA," and that "Planstin effectively repudiated the BSA almost immediately" by informing Clearwater that it could not provide Clearwater with an individual insurance MEC Plan. *Id.* ¶ 12.[3]

Clearwater alleges that in early 2022, the parties agreed to a new schedule for Clearwater's commissions and fees when it referred clients to Defendants under the Broker Commission Agreement. On April 14, 2022, Clearwater and Planstin executed the "Commission Addendum to Business Services Agreement" ("Commission Addendum"), which memorialized the new fee schedule for Clearwater's commissions and fees. Dkt. 14-2. The Commission Addendum also specifically states: "The terms of this Addendum are hereby incorporated into the Business Services Agreement between Client and Planstin, dated December 2, 2021 (the 'BSA')." *Id.* at 2.[4]

Clearwater alleges that for the first few months of the Commission Addendum's term, Defendants paid their required commissions to Clearwater. In July 2022, Clearwater alleges, it

---

[3] Defendants disagree and contend that both parties performed under the BSA and its Addendum: "Clearwater sold Planstin products and Planstin paid certain fees and commissions to Clearwater." Second Amended Answer and Counterclaim (Dkt. 22) ¶ 29.

[4] Plaintiff argues that, "[w]hile the Commission Addendum states it is incorporated into the BSA, the BSA's terms are not incorporated into the Commission Addendum." Dkt. 10 ¶ 16.

learned that the State of Washington Insurance Commission sent Zion a cease and desist order accusing Zion of operating an illegal insurance company. Dkt. 10 ¶ 18. Clearwater then notified Defendants that

> it was recommending to some of its clients to move from Planstin and Zion to new providers based on the issues discovered about Planstin and Zion, and other operational difficulties Clearwater experienced (not all of Clearwater's clients were enrolled in non-compliant plans; some of those clients are enrolled in compliant plans).

*Id.* ¶ 19. Clearwater alleges that Defendants refused to accept Clearwater's notice on behalf of its clients to terminate their memberships and made false and disparaging statements about Clearwater to Clearwater's clients. *Id.* Clearwater further alleges that Defendants stopped paying Clearwater its fees and commissions from July 2022 to the present, in violation of the Broker Commission Agreement and Commission Addendum. *Id.* ¶ 20.

On August 10, 2022, Clearwater filed this lawsuit against Defendants. In its First Amended Complaint Clearwater asserts (1) breach of contract based on Defendants' alleged failure to pay fees and commissions under the Broker Commission Agreement and Commission Addendum; (2) negligent misrepresentation; and (3) a claim for attorney's fees under Chapter 38 of the Texas Civil Practice & Remedies Code.

Defendants also have filed a breach of contract counterclaim against Clearwater, alleging that Clearwater breached the BSA by disclosing Planstin's confidential and proprietary information to third parties, misappropriating Planstin's trade secrets, and making and/or publishing false, misleading, or deceptive claims concerning Planstin. On November 30, 2022, Clearwater filed a Motion to Dismiss (Dkt. 24) Defendants' counterclaim, which is pending before the District Court.

In the instant Motion, Defendants move to compel Clearwater to arbitration based on the Arbitration Clause in the BSA and dismiss Clearwater's lawsuit. Clearwater opposes the motion, arguing that the Arbitration Clause does not apply to its claims.

## II.      Legal Standards

The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). The purpose of the FAA is "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000). "Accordingly, there is a strong presumption in favor of arbitration and a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter v. Countrywide Credit Indus.*, 362 F.3d 294, 297 (5th Cir. 2004).

> Under the Act, arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms. Applying the Act, we have held that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also "'gateway' questions of 'arbitrability,'" such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (citation omitted) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)). An "agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Ctr.*, 561 U.S. at 70.

Courts in the Fifth Circuit apply a two-step analysis to determine whether parties should be compelled to arbitrate a dispute. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). First, the court applies state law to determine "whether the parties entered into *any*

*arbitration agreement at all*." *Id.* Second, the court interprets the contract "to determine whether

*this* claim is covered by the arbitration agreement." *Id.* At step two, courts normally interpret the

contract to determine whether the claims are covered by the arbitration agreement. *Id.*

While the second step ordinarily is for the court, "the analysis changes where the agreement

delegates to the arbitrator the primary power to rule on the arbitrability of a specific claim. In such

a case, courts ask only whether there is a valid delegation clause. If there is, then the *arbitrator*

decides whether the claim is arbitrable." *Matter of Willis*, 944 F.3d 577, 579-80 (5th Cir. 2019),

*cert. denied*, 140 S. Ct. 2828 (2020) (cleaned up). As the Fifth Circuit explained in *Kubala*:

> Delegation clauses are enforceable and transfer the court's power to decide arbitrability questions to the arbitrator. Thus, a valid delegation clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues.
>
> Thus, if the party seeking arbitration points to a purported delegation clause, the court's analysis is limited. It performs the first step—an analysis of contract formation—as it always does. But the only question, after finding that there is in fact a valid agreement, is whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated. If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases.

830 F.3d at 202.

### III.     Analysis

Defendants argue that Clearwater should be compelled to arbitrate its claims in this lawsuit

because they are governed by the binding Arbitration Clause contained in the BSA. Clearwater

argues that the clams in this lawsuit are not governed by the Arbitration Clause in the BSA.

The Court applies the two-step *Kubala* analysis to determine whether the parties should be

compelled to arbitrate this dispute.

### A.  Agreement to Arbitrate

At step one of the analysis, the Court asks whether the parties entered into a valid arbitration agreement. *Kubala*, 830 F.3d at 201. The BSA Clearwater and Planstin entered into on December 2, 2021, contains the following Arbitration Clause:

> 23. **DISPUTE RESOLUTION: MEDIATION THEN BINDING ARBITRATION.** If a dispute arises from or relates to this Agreement or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties agree to endeavor first to settle the dispute by mediation with an agreed mediator before resorting to arbitration. The parties further agree that any unresolved controversy or claim *arising out of or relating to this Agreement*, *or breach thereof, shall be settled by binding arbitration administered privately in accordance with the American Arbitration Association's Commercial Arbitration Rules* and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Dkt. 14-1 § 23 (emphasis added). Additionally, the BSA states that the parties waived their rights to a jury trial in any legal proceeding arising out of or related to the BSA; agreed that Utah law would apply; and that, "[i]f a dispute, controversy or claim arises out of or relates to this Agreement, or the breach thereof, the venue for dispute resolution will be determined by the rules of the American Arbitration Association and the discretion of the arbitrator." *Id.* ¶ 24.

Clearwater does not dispute that it signed and executed the BSA, and that "the BSA contains a valid and binding arbitration agreement." Dkt. 12 at 3. Accordingly, the parties entered into a valid arbitration agreement.

### B.  Arbitrability

Next, the Court turns to the question of contract interpretation and asks whether Plaintiff's claims are covered by the Arbitration Clause. *Kubala*, 830 F.3d at 201. While ordinarily this step would be a question for the Court, Defendants argue that the parties have delegated to the arbitrator the power to decide whether Plaintiff's claims are arbitrable by expressly incorporating the AAA

Rules. Clearwater does not directly respond to Defendants' delegation argument, but instead argues that its claims arise out of the Broker Commission Agreement and Commission Addendum and "do not arise under the terms of the BSA's arbitration clause." Dkt. 12 at 3.

Whether Clearwater's claims arise out of the BSA is a gateway question of "arbitrability." *See Henry Schein*, 139 S. Ct. at 529 (noting that "gateway" questions of arbitrability include whether the parties have agreed to arbitrate "whether their agreement covers a particular controversy"). Thus, the Court first must determine whether there is a valid delegation clause that delegates the question of arbitrability to the arbitrator.

When considering whether there is a valid delegation clause, "the court's analysis is limited." *Kubala*, 830 F.3d at 202. The Court first must "turn to the delegation clause and ask whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Archer & White Sales, Inc. v. Henry Schein, Inc*., 935 F.3d 274, 279 (5th Cir. 2019) (internal citation and quotations omitted), *cert. denied*, 141 S. Ct. 113 (2020). "When determining that intent, '[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so.'" *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). A contract need not contain an express delegation clause to meet this standard. *Id.* Rather, "an arbitration agreement that incorporates the AAA Rules 'presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.'" *Id.* (quoting *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012)).

Here, the Arbitration Clause in the BSA states that "any unresolved controversy or claim arising out of or relating to this Agreement, or breach thereof, shall be settled by binding arbitration

administered privately in accordance with the American Arbitration Association's Commercial

Arbitration Rules." Dkt. 14-1 § 23. Rule 7 of the AAA Rules states that:

> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.
>
> (b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

The express adoption of the AAA Rules "presents clear and unmistakable evidence that the parties

agreed to arbitrate arbitrability." *Petrofac*, 687 F.3d at 675; *see also Arnold v. Homeaway, Inc.*,

890 F.3d 546, 553 (5th Cir. 2018) (holding that the parties clearly and unmistakably delegated

arbitrability to the arbitrator where the arbitration clause expressly incorporated AAA Rules);

*Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 263 (5th Cir. 2014) (holding

that whether plaintiff's claims were subject to arbitration had to be decided by the arbitrator where

the agreement incorporated the AAA Rules). Therefore, whether Clearwater's claims arise out of

the BSA and are subject to arbitration must be decided in the first instance by the arbitrator, not

by the Court. *See id.* As the Supreme Court explained in *Henry Schein*:

> When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.

139 S. Ct. at 529. Accordingly, Defendants' Motion to Compel Arbitration should be granted.

### C.  Conclusion

Once the court determines that a motion to compel arbitration should be granted, the FAA instructs the court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. The Fifth Circuit, however, has held that dismissal, as opposed to a stay pending arbitration, is proper "when *all* of the issues raised in the district court must be submitted to arbitration." *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *see also Griggs v. S.G.E. Mgmt., L.L.C.*, 905 F.3d 835, 839 (5th Cir. 2018) ("Some circuits have held that district courts must stay a case when all claims are submitted to arbitration, but this circuit allows district courts to dismiss such claims outright."); *Adam Techs. Int'l S.A. de C.V. v. Sutherland Global Servs., Inc.*, 729 F.3d 443, 447 n.1 (5th Cir. 2013) ("Although Section 3 of the Federal Arbitration Act directs district courts to stay pending arbitration, we are bound by our precedent which states that dismissal is appropriate 'when *all* of the issues raised in the district court must be submitted to arbitration.'") (quoting *Alford*, 975 F.2d at 1164)).

As explained in detail above, whether Clearwater's claims in this lawsuit arise out of the Arbitration Clause contained in the BSA must be referred to the arbitrator because the Arbitration Clause contains a delegation clause. In addition, Clearwater does not dispute that Defendants' breach of contract counterclaim arises out of the BSA and should be referred to arbitration. *See* Dkt. 12 at 1 ("To the extent Defendants' counterclaim survives dismissal, Clearwater does not dispute that the counterclaim—and only the counterclaim—should be referred to mediation and arbitration."). Accordingly, Defendants' counterclaim and Clearwater's pending Motion to Dismiss that counterclaim (Dkt. 24) also must be referred to arbitration. Because all issues in this lawsuit must be referred to arbitration, the Court recommends dismissal of this action. *Alford*, 975 F.2d at 1164).

## IV.     Recommendation

Based on the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that the District Court **GRANT** Defendants' Motion to Compel Arbitration of Plaintiff's Claims (Dkt. 8) and **DISMISS** Clearwater's lawsuit without prejudice.

The Court **FURTHER ORDERS** that the Clerk remove this case from the Magistrate Court's docket and **RETURN** it to the docket of the Honorable Robert Pitman.

## V.     Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on January 9, 2023.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE

12